IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE HUTTON GROUP, INC., ) | |
|     Plaintiff, ) | |
| ) | |
| vs. ) | Civil Action No. 09-700 |
| ) | |
| ADVANTAGE MARKETING ) | |
| INTERNATIONAL, INC. and HARVEY ) | |
| SLATER, individually, ) | |
|     Defendants. ) | |

MEMORANDUM OPINION

Plaintiff, The Hutton Group, Inc., brings this breach of contract action against Defendants, Advantage Marketing International, Inc. (Advantage) and Harvey Slater, individually (Slater), arising out of Defendants' failure to deliver tickets Plaintiff had ordered for the 2008 Olympic Games.

Presently before this Court for disposition is a motion for summary judgment, brought by Defendant Slater. For the reasons that follow, the motion will be granted.

Facts

Plaintiff is a corporation which supplies tickets and corresponding services for sporting and entertainment events, such as the Olympics, Super Bowls, World Cup soccer and golf tournaments. Advantage is a corporation which is in the business of brokering tickets for sporting and entertainment events, such as those cited above. Slater is the sole shareholder, president and/or chief executive officer of Advantage. (Compl. ¶¶ 1-4; Answer ¶¶ 1-4; Slater Aff. ¶¶ 2-4.)[1]

---

[1] ECF No. 1 Ex. A; ECF No. 4; ECF No. 31 Ex. 1.

Slater asserts that Advantage followed corporate formalities and held annual corporate meetings, maintained corporate minutes, remained in good standing with the State of Florida, used corporate bank accounts, and conducted business in the corporate name. No corporate funds were commingled with personal funds. (Slater Aff. ¶ 4.) Plaintiff responds that Slater opened a bank account with the Royal Bank of Scotland (RBS) in both his name and the name of his wife, Miriam; and further that he deposited funds advanced by Plaintiff to Advantage in this account. (Slater Aff. ¶ 18; Slater Dep. at 47-49.[2])

Advantage at all times and pertinent hereto was acting by and through its duly authorized agents, servants and/or employees, including but not limited to Slater. (Compl. ¶ 3; Answer ¶ 3.) Slater did business with Shirley Hutton, present owner of Plaintiff Hutton Group, as co-owner of Sports & Hospitality International, Inc. (SHI), for the 2000 Olympics. Both Slater and Hutton owned interests in SHI and did business together. (Slater Aff. ¶ 6.) Shortly after the 2000 Olympics, Shirley Hutton purchased Slater's half of SHI and she is the present owner. (Slater Aff. ¶ 7.)

Slater did business with Plaintiff as an employee of TAJ Sports & Entertainment, Inc. (TAJ) for Masters Golf in approximately 2001 or 2003. TAJ was sold out to another company in approximately2005. Slater was an employee of TAJ, and never had any interest as owner or director or officer. (Slater Aff. ¶ 8.) All tickets for Masters Golf ordered by Plaintiff from TAJ were delivered. (Slater Aff. ¶ 9.) Slater did business with Plaintiff as owner of Advantage for World Cup Soccer in 2006 and Olympics in 2008. (Slater Aff. ¶ 10.)

Slater states that, for 2006 World Cup Soccer in Germany, Plaintiff ordered tickets from a

---

[2] ECF No. 36.

party in South Africa, but some of the tickets were not delivered and Plaintiff approached Slater, who was able to supply the tickets needed from its supplier, Desmond Lacon (Lacon), who resides in England. Lacon delivered them to Plaintiff's customers in various German cities. Based on this performance, as all tickets that were ordered were delivered, all parties had confidence in the ability of Lacon to supply tickets to a major event. (Slater Aff. ¶ 11.) Slater states that Lacon had previously supplied tickets to Slater's company for the 1996 Olympics and for Wimbledon. This also gave Slater confidence in Lacon's ability to come through with tickets for major events. (Slater Aff. ¶ 12.) Plaintiff denies that it knew the identity of the person who provided the tickets to Defendants for this event.

Plaintiff ordered tickets from Advantage for the opening and closing ceremonies and various events for competitions of the 2008 Summer Olympic Games in Beijing, China. (Slater Aff. ¶ 13.) Plaintiff knew that Advantage did not have the tickets in its inventory for the 2008 Olympics. All tickets had to be supplied by National Olympic Committees (NOCs), who provided them to various brokers and agents. Advantage made agreements to purchase tickets from parties who were supplied tickets by NOCs. (Slater Aff. ¶ 14.)

Slater states that Lacon agreed to supply tickets to Advantage for opening and closing ceremonies for the 2008 Olympics, with the understanding that he would obtain these tickets from a supplier in China who was expected to receive the tickets from an NOC. (Slater Aff. ¶ 15.) The terms for Lacon to obtain these tickets was for fifty percent of the purchase price to be paid in advance (25% to start and another 25% afterward). (Slater Aff. ¶ 16.) Plaintiff states that it was unaware of identity of the person and/or entity that would be supplying the tickets to Advantage.

For the tickets ordered by Plaintiff, funds were advanced by Plaintiff to Advantage; Advantage forwarded the funds to Lacon; and Lacon represented that he forwarded the funds to the supplier in China. (Slater Aff. ¶ 17.) Most of the funds advanced by Plaintiff to Advantage were wired through an account at RBS that Slater had established in his name and the name of his wife. Slater states that he looked into setting up an account for Advantage, but the bank required large balances to be held in a corporate account and it was not feasible to set up a corporate account for Advantage. (Slater Aff. ¶ 18.)

Slater states that the RBS account was only used for corporate funds of Advantage, that there were never personal funds in the account, that there was no commingling of personal and corporate funds in this account, and that the account was used as a conduit to receive funds from the USA and Europe so the funds could be transferred to Europe and other places. (Slater Aff. ¶ 19.) Plaintiff responds that Slater deposited funds it advanced in the RBS account and that he loaned his son the sum of $50,000 from this account. (Slater Dep. at 49-50.)

Slater asserts that RBS was convenient for Advantage to use because it dealt with money in dollars, euros and pounds in one institution. (Slater Aff. ¶ 20.) He further asserts that, at all times for this transaction, Plaintiff was aware of the process for obtaining the tickets and that Lacon was receiving the money from Advantage to purchase them from the supplier in China, and that they had confidence in Lacon's ability to provide tickets that he promised for the 2008 Olympics because he successfully supplied tickets to Advantage for the 1996 Olympics and the 2006 World Cup. (Slater Aff. ¶ 21.) Plaintiff reiterates that it did not know that Lacon was responsible for obtaining the tickets.

Slater states that tickets for opening and closing ceremonies for the 2008 Olympics were

4

not to be made available to anyone until approximately one week before the event; that all other Olympics tickets were delivered about two months before the event; and that all parties had to travel to Beijing to pick up and deliver the tickets for opening and closing ceremonies that were promised. (Slater Aff. ¶ 22.) Plaintiff indicates that it had no knowledge of these facts.

During the week before the opening and closing ceremonies, all parties were getting ready to pick up the tickets for delivery, and they waited for Lacon to deliver his tickets. About three or four days before the event was to begin, after several days of stalling, Lacon met with Plaintiff and Advantage, through their representatives, and told them for the first time that he was not able to deliver the tickets. (Slater Aff. ¶ 23.) Advantage has continued to do business since 2008 and it was disclosed in the deposition in this case that Advantage is purchasing and selling tickets in 2010 for Yankees games, US Open Tennis and World Cup events. (Slater Aff. ¶ 24.)

Plaintiff states that, over a period of approximately twelve years, it and Slater entered into a series of oral agreements whereby Slater, through a series of ever-changing corporate entities, would supply Plaintiff with tickets to high-end sporting and entertainment events. (Compl. ¶ 5.) Slater responds that he has transacted business with Plaintiff for a few specific sporting and entertainment events. (Answer ¶ 5.) Plaintiff states that Slater delivered these tickets to it in Allegheny County, but Slater responds that he delivered the tickets directly to Plaintiff's clients. (Compl. ¶ 6; Answer ¶ 6.)

Plaintiff states that, during Advantage's Annual Meeting of the Board of Directors/ Shareholders/Officers on December 31, 2004, Slater changed the principal location of Advantage's office from Florida to Connecticut and that Slater rents a property in Florida every year during the months of January, February and March. (Slater Dep. at 8.)

Procedural History

Plaintiff filed this action on April 24, 2009 in the Court of Common Pleas of Allegheny County, Pennsylvania. Count I alleges a breach of contract claim against Advantage and Count II alleges a breach of contract claim against Slater individually.

On June 3, 2009, Defendants removed the action to this Court based on diversity of citizenship, 28 U.S.C. § 1332, because Plaintiff is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania; Advantage is a corporation organized and existing under the laws of the State of Florida; Slater is a resident of the State of Connecticut; and the amount in controversy exclusive of interest and costs, exceeds $75,000.00. (Notice of Removal ¶¶ 3-5.) On September 9, 2010, Slater filed a motion for summary judgment.

Summary Judgment

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v.

Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).

Choice of Law

In a diversity case, a federal court applies the choice-of law-rules of the forum state, Pennsylvania. Klaxon v. Stentor Electric Mfg. Co., 313 U.S. 487 (1941). The Court of Appeals for the Third Circuit has explained that:

> Pennsylvania applies a "flexible rule which permits analysis of the policies and interests underlying the particular issue before the court" and directs courts to apply the law of the state with the "most interest in the problem." Hammersmith v. TIG Ins. Co., 480 F.3d 220, 227 (3d Cir. 2007) (quoting Griffith v. United Air Lines, Inc., 416 Pa. 1, 203 A.2d 796, 805-06 (1964)); see Budtel Assocs., LP v. Continental Cas. Co., 915 A.2d 640, 644-45 (Pa. Super. Ct. 2006) (holding that the Griffith choice of law rule applied in the contract law context). In applying this rule, if confronted with a true conflict, we first consider each state's contacts with the contract as set forth in the Restatement (Second) of Conflict of Laws. We then "weigh the contacts on a qualitative scale according to their relation to the policies and interests underlying the [relevant] issue." Shields v. Consol. Rail Corp., 810 F.2d 397, 400 (3d Cir.1987).

Specialty Surfaces Int'l, Inc. v. Continental Casualty Co., 609 F.3d 223, 229-30 (3d Cir. 2010) (some citations omitted). The first step in a choice-of-law analysis is to determine if there is a true conflict between the relevant states' laws. A deeper choice of law analysis is necessary only if both states' interests would be impaired by the application of the other's laws. "When states' interests would be harmed by the application of the other state's law, there is a 'true conflict,' and we must engage in the contacts and interests analysis to determine which state's law should apply." Id. at 230 (citations omitted).

Under Florida law, the rule is that the corporate form is generally observed and "the

7

corporate veil may not be pierced absent a showing of improper conduct." Dania Jai-Alai Palace, Inc. v. Sykes, 450 So.2d 1114, 1121 (Fla. 1984). Three factors must be proven by a preponderance of the evidence:

> (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation;
>
> (2) the corporate form must have been used fraudulently or for an improper purpose; and
>
> (3) the fraudulent or improper use of the corporate form caused injury to the claimant.

Seminole Boatyard, Inc. v. Christoph, 715 So.2d 987, 990 (Fla. App. 1998) (citations omitted).

Similarly, the Pennsylvania Supreme Court has held that:

> there is a strong presumption in Pennsylvania against piercing the corporate veil. Wedner v. Unemployment Board, 449 Pa. 460, 464, 296 A.2d 792, 794 (1972) ("[A]ny court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception.... Care should be taken on all occasions to avoid making the entire theory of corporate entity * * * useless. Zubik v. Zubik, 384 F.2d 267, 273 (3d Cir.1967)"). Also, the general rule is that a corporation shall be regarded as an independent entity even if its stock is owned entirely by one person. College Watercolor Group, Inc. v. William H. Newbauer, Inc., 468 Pa. 103, 117, 360 A.2d 200, 207 (1976).

Lumax Indus., Inc. v. Aultman, 669 A.2d 893, 895 (Pa. 1995). The court cited the following factors to be considered: "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetrate a fraud." Id. (citation omitted).

Although the tests use slightly different language, they do not appear to apply a different standard and thus no true conflict exists in this case. Indeed, although the

8

parties discuss the laws of both states, they have not identified an actual conflict with respect to the question presented. Moreover, in Slater's reply brief, he agrees for the purposes of the motion that Pennsylvania law should apply to this claim.

Slater argues that Plaintiff has not met its burden of demonstrating that the corporate veil should be pierced and that he should be held liable for actions taken by Advantage. He notes that Advantage has done substantial business in addition to the Olympics, including World Cup in 2006 and 2010, Master Golf, Yankees, US Open Tennis and many other events and has continued to do business through 2010; that Advantage has followed corporate formalities and held annual corporate meetings, maintained corporate minutes, remained in good standing with the State of Florida, used corporate bank accounts, and conducted business in the corporate name; that Plaintiff has not alleged that he engaged in any wrongdoing, that it was misled or defrauded or that there was any improper conduct (other than the breach of contract by Advantage).

Plaintiff contends that there are genuine issues of material fact regarding whether Advantage was merely a façade for Slater's operations. Specifically, Plaintiff argues that, although Slater maintains that Advantage held annual meetings, a genuine issue of material fact exists as to whether the meetings actually took place because Slater was the only person present, the meetings took place on January 10 of each year (whether that day was a weekday or a weekend), and six of the meetings are listed as having taken place at Advantage's office in Westport, Connecticut even though Slater testified that he spends the months of January, February and March of each year in Florida. (Pl.'s Br. Opp'n

9

Slater Mot. Summ. J. Ex. A[3]; Slater Dep. at 8.)  Plaintiff also challenges Slater's contention that there was no commingling of personal and corporate funds because Slater opened the RBS account under his name and the name of his wife Miriam, Plaintiff's funds were placed in the account and Slater loaned his son $50,000 from the same account.

Plaintiff cites Fletcher-Harlee Corp. v. Szymanski, 936 A.2d 87 (Pa. Super. 2007). In that case, the Superior Court held that the plaintiff presented enough evidence to justify piercing the corporate veil and holding Szymanski, the sole owner and shareholder of a concrete company (Delmarva) liable for a $300,000.00 judgment entered against it, after Delmarva ceased doing business and declared bankruptcy, while Szymanski remained in the concrete business and performed jobs through a new company (Del Concrete) of which he was also the sole shareholder, director and officer.  The Superior Court found the following facts sufficient to pierce the corporate veil: 1) Szymanski incorporated several different concrete companies, which supposedly were located in different suites in the same building, but he could not produce leases to prove a separate existence; 2) Szymanski either did not keep proper financial records or purposely withheld them from the plaintiff and had no evidence that the companies kept their finances separate from each other; 3) Szymanski often loaned Delmarva money to operate; 4) Szymanski made the decision not to defend Delmarva in the arbitration proceeding, resulting in a judgment against it, but the judgment could not be satisfied because Delmarva had no assets and owned no equipment; 5) after Szymanski stopped operating Delmarva, he began

---

[3]   ECF No. 35.

operating Del Concrete out of the same offices; 6) Szymanski failed to produce bank statements for Del Concrete during discovery and when questioned in court, he answered equivocally or said "I don't remember" or "I don't know"; and 7) Szymanski could not explain why certain checks which appeared to be corporate in nature were in his personal bank account.

The court concluded that the evidence demonstrated that Delmarva was undercapitalized, that it failed to adhere to corporate formalities, that Szymanski intermingled corporate and personal affairs (although not "substantially"), that Szymanski did not utilize Delmarva to perpetuate a fraud, but that he disregarded the separate legal status of Delmarva, thus further rendering its corporate form to be a sham. Therefore, it concluded that the plaintiff overcame the strong presumption against piercing the corporate veil and Szymanski could be held liable for the judgment against Delmarva.

In this case, by contrast, Plaintiff has not argued or presented evidence that Advantage is undercapitalized and Slater has asserted that the company continues to do business in 2010, an assertion Plaintiff has not challenged. Thus, this factor does not weigh in favor of piercing the corporate veil.

Plaintiff has raised questions as to whether Advantage observed all of the corporate formalities, because the Annual Meetings were held each year on January 10 even if that date fell on a weekend and even if he was in Florida rather than Connecticut as stated in the minutes. Slater responds that the documents show he waived notice of the Annual Meeting each year and that, in accordance with corporate law and the bylaws of the corporation, he consented to the adoption of recitals and resolutions, such that the

11

meeting was deemed held in Connecticut and he ratified and approved all actions of the directors, shareholders and officers for the prior year. Thus, he contends that he followed the corporate formalities and that it makes no material difference whether he was physically present in Connecticut on January 10 of each year because he was the sole shareholder/director/officer and he adopted the resolutions by acclimation. He also notes that Plaintiff has admitted that Advantage maintained corporate minutes, remained in good standing with the State of Florida, used corporate bank accounts and conducted business in the corporate name; that Advantage at all times acted through its authorized agents; and that Plaintiff ordered the tickets for the 2008 Olympics through Advantage, the corporation. This factor also does not weigh in favor of piercing the corporate veil.

With respect to the issue of intermingling personal and corporate affairs, Plaintiff cites the fact that the RBS account was held in the name of Slater and his wife, but Slater notes that it has not presented evidence of actual commingling of corporate and personal funds. Slater argues that Plaintiff has presented only a legal question as to whether having one corporate bank account in the name of individuals constitutes intermingling of personal and corporate affairs. With respect to the one instance in which Slater drew a loan for his son from the RBS account, Slater responds that Plaintiff has not alleged or presented evidence that this transaction was not conducted at arm's length, that it did not have a valid business purpose, that it was not a legitimate loan or that he (Slater) personally benefitted from it. Moreover, even assuming that the loan was improper, Plaintiff has not demonstrated that Slater <u>substantially</u> intermingled corporate and personal affairs. Thus, this factor does not weigh in favor of piercing the corporate veil.

12

Finally, Slater argues that Plaintiff has not even attempted to demonstrate that he used Advantage to perpetuate a fraud. In conclusion, Plaintiff has not met its burden of overcoming the "strong presumption" that the corporate veil should not be pierced and therefore Slater's motion for summary judgment will be granted.

An appropriate order follows.


s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge


Dated: October 5, 2010